NOTICE
Decision filed 01/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230321-U

NO. 5-23-0321

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 20-CF-256 |
| | ) | |
| DEREK D. SCHORMAN, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's denial of reputation testimony was harmless error. The State had proven the essential elements of aggravated criminal sexual abuse and defense counsel was not ineffective in eliciting additional testimony regarding the defendant's age.

¶ 2    After a jury trial, the defendant was convicted of aggravated criminal sexual abuse and sentenced to four years of probation and 180 days in jail. The defendant appeals the circuit court's decision to exclude a defense witness who would have testified that the victim had a reputation for dishonesty. The defendant additionally argues that he received ineffective assistance where defense counsel presented testimony of the defendant's age, an essential element of aggravated criminal sexual abuse, after the State failed to prove that the defendant was over 17 years old at the time of the offense. For the following reasons, we affirm the defendant's convictions and sentence.

1

¶ 3                                    I. BACKGROUND

¶ 4       On October 5, 2020, Derek Schorman, the defendant, was charged by information with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)). He had allegedly touched the vagina of 10-year-old M.W. with his hand. The defendant, born on December 26, 1976, was M.W.'s uncle.

¶ 5       The three-day jury trial began on January 23, 2023, with jury selection. On that same day, the State filed a motion *in limine* to bar testimony of M.W.'s reputation for truthfulness. Specifically, the State sought to exclude the reputation testimony of one of M.W.'s aunts, Sarah Flowers.

¶ 6       On the second day of trial, January 24, 2023, the circuit court addressed the pending motions *in limine*, including the State's motion to bar reputation testimony, in chambers and outside of the presence of the jury. The State argued that the defense only disclosed Flowers's personal experiences of M.W.'s dishonesty. The State additionally argued that Flowers lived in a different community than M.W. and Flowers was without knowledge of M.W.'s general reputation within her own community. The circuit court reserved its ruling until the defense presented an offer of proof.

¶ 7       After the circuit court addressed the motions *in limine*, the jury trial resumed, and the parties presented opening statements. The State presented testimony from David Kinkelaar, a deputy with the Effingham County Sheriff's Department. Kinkelaar was dispatched to respond to the complaint of sexual assault involving M.W. Kinkelaar spoke to M.W.'s mother, Nicole Westendorf (Mother), regarding the complaint that M.W. had been inappropriately touched by her uncle, the defendant, on several occasions during the time period of July of 2020 to August of

2020. Because M.W. was a minor, Kinkelaar refrained from interviewing M.W. Rather, she was interviewed at the Child Advocacy Center (CAC) by a forensic interviewer.

¶ 8 Mother testified next and explained that the defendant was married to her husband's sister. At family functions, M.W. enjoyed spending time with the defendant's oldest daughter, O.S., who was three or four in 2020. Mother testified that on July 12, 2020, the defendant's youngest daughter, D.S., was baptized. Fifteen to 20 family members gathered at the defendant's house after the baptism to celebrate.

¶ 9 Approximately a month after the baptism, M.W. told Mother that the defendant had touched her "no-no parts" when she was watching television in the defendant's basement on the day of the baptism. The defendant had "rubbed" M.W.'s vagina over her underwear.

¶ 10 M.W. had also informed Mother that the defendant had touched her multiple times during a weekend camping trip. Mother testified to the details of what occurred including that the defendant rubbed M.W.'s vagina when he tucked her in the first night of the camping trip. He also asked M.W. if it "tickled." The next day, the defendant rubbed M.W.'s nipples under her shirt when she was watching a movie with the defendant and O.S. M.W. also told Mother that the defendant had placed M.W.'s hand on his "private parts" three or four times. M.W. kept pulling her hand away and the defendant would move it back. On the second evening of the camping trip, the defendant tucked the children into bed and touched M.W. again, even though M.W. had tried to tuck her blanket tightly around herself to prevent the defendant from touching her.

¶ 11 After M.W. told Mother about the incidents, Mother had M.W. repeat the allegations to M.W.'s father and grandparents. Mother additionally video recorded M.W. describing the incidents. Mother used the recording to confront the defendant, and he denied the allegations. The video recording of M.W. was published for the jury and admitted into evidence.

¶ 12    Mother reported the defendant to law enforcement and the Department of Children and Family Services (DCFS) approximately a month after M.W. had informed her about the incidents. Mother testified that she did not immediately report the defendant because he was family. Mother's family had attended another baptism and the defendant was present, but otherwise Mother and her family stopped attending most family functions.

¶ 13    After Mother's testimony concluded, M.W. testified that she was 12 years old and in the seventh grade at the time of the trial. The defendant was her uncle, and she had not been allowed to see the defendant for two years because she had been "touched inappropriately."

¶ 14    M.W. testified that when she was 10 years old, she attended her cousin's baptism. She had worn a dress to the baptism. After D.S. was baptized and everyone returned to the defendant's house, the children played in the defendant's basement and watched a movie. The children watched the movie from in front of the couch in the basement, but M.W. stayed behind the couch. M.W. explained that she laid inside of a foldable tube that children crawl through, which was covered in blankets, and the tube was on top of a small trampoline.

¶ 15    M.W. testified that the defendant appeared in the basement while they watched the movie, and he had looked inside the tube. The defendant touched M.W. for a few seconds on her "lower inappropriate part," under her dress and over her underwear. M.W. did not immediately tell anyone about being touched by the defendant.

¶ 16    M.W. testified to additional incidents where she was inappropriately touched by the defendant. M.W. had joined the defendant, his two children, and his wife on a two-day camping trip approximately a month after the initial incident. M.W. testified that during the first evening, the defendant had touched her on top of her underwear "in the lower private area while tucking

me in." M.W. further testified that when the defendant was touching her vagina inappropriately, he had asked her if it "tickled."

¶ 17   The following afternoon, on the camping trip, M.W. watched a movie with O.S. and the defendant inside of the camper. M.W. testified that the defendant was sitting next to her, and he rubbed her chest. She could not remember if he touched her on top or underneath of her shirt. M.W.'s aunt who was married to the defendant began to open the door of the camper, and the defendant stopped touching M.W. before the door fully opened. Her aunt was inside the camper for approximately a minute. After she left, defendant grabbed M.W.'s hand and put it "on his private part." When M.W. removed her hand, he placed it back. After the defendant repeated placing M.W.'s hand on his private area, M.W. took O.S. outside to get away from the defendant.

¶ 18   M.W. further testified that on the second night of camping, she tried to tuck the blankets underneath herself to prevent the defendant from touching her. M.W. was unable to prevent the defendant from touching her again on her vagina. After he touched her, the defendant said goodnight and left the sleeping area.

¶ 19   Approximately a month later, M.W. told Mother about the multiple incidents. M.W. explained that she was afraid to say anything initially, and she did not know how to tell anyone. M.W. was asked to identify her uncle in the courtroom and she pointed to the defendant.

¶ 20   On cross-examination, the defense emphasized discrepancies between M.W.'s trial testimony and the CAC interview regarding the incident that occurred in the defendant's basement on the day of the baptism. The State stipulated to those discrepancies that M.W. made during the CAC interview, which were contrary to M.W.'s trial testimony. The State additionally stipulated that during the CAC interview, M.W. had stated that the defendant touched her for "a great while" and she had also stated that it was for "a minute or two." The circuit court explained that a

5

stipulation meant that the State agreed with what was said during the CAC interview, and that the CAC interview video would be shown to the jury in its entirety.

¶ 21    The defense then questioned M.W. about the camping incident. M.W. could not recall information from the CAC interview regarding where the defendant had touched her. The State stipulated that during the CAC interview, M.W. stated that the defendant touched her breast area and her vagina in the afternoon. The State also stipulated that during the CAC interview, M.W. had stated that the defendant touched her breasts and vagina Saturday evening, which was contrary to M.W.'s trial testimony.

¶ 22    The defense then questioned M.W. on the video recording made by Mother that had previously been published to the jury. M.W. was aware of the video but she could not recall statements made on the video. The State stipulated that on the video, M.W. stated that on Friday night the defendant had touched her when he tucked her in, then he tucked his daughter in, and then he stood up and had inappropriately touched M.W. again. M.W. additionally testified that the incidents occurred over two years prior to the trial date, and she could not recall all the details. M.W. remembered that the defendant had touched her and that she was telling the truth to the best of her recollection.

¶ 23    After M.W.'s testimony concluded, Amber Edmonds, the CAC forensic interviewer, testified that she interviewed M.W. in September of 2020. Edmonds testified that the interview was video recorded, and the CAC interview, which was previously referenced during M.W.'s cross-examination, was published to the jury. Edmonds also testified that M.W. was consistent with her statements during the interview.

¶ 24    Joseph Solan, a detective with the Effingham County Sheriff's Department, testified that he was involved in the investigation related to M.W.'s allegations against the defendant. Because

the events had occurred over a month prior to the reporting, no physical evidence was obtained. Solan had interviewed Mark Westendorf, an uncle of M.W.'s, who had attended the baptism and family gathering at the defendant's house. Mark provided a statement that M.W. was downstairs with the other children on the day of the baptism. The defendant went downstairs "to let the kids know it was time for cake and ice-cream." Solan found this information significant because it was consistent with M.W.'s statement of why the defendant went downstairs.

¶ 25 The State rested at the end of the second day of trial. The defense moved for a directed verdict and argued that no evidence demonstrated any type of sexual gratification. The defense further argued that there were contradictions in the witness testimony and mere suspicion was not sufficient to satisfy the legal requirements in this matter. The State argued that sufficient evidence was presented for the jury to find all of the elements of the offense. The circuit court denied the defendant's motion for a directed verdict.

¶ 26 On the third day of trial, the defense informed the circuit court that it intended to call Flowers as an impeachment witness. The defense proceeded with an offer of proof outside the presence of the jury. The defense stated that it expected Flowers to testify that she was a member of M.W.'s family, that M.W. and Flowers were members of the same community, and Flowers was familiar with M.W.'s reputation in the community for embellishing stories to become the center of attention. The State responded that the only information the defense had disclosed on Flowers failed to include M.W.'s reputation in the community. Rather, the disclosed statements included specific examples of personal experiences which shaped Flowers's opinion of M.W.

¶ 27 The circuit court then proceeded with an inquiry of Flowers, outside of the presence of the jury. Flowers testified that M.W. was her niece, she had known M.W. for her entire life, and they spend time together several times a year at family gatherings.

¶ 28    The defense asked Flowers is she was "familiar with [M.W.'s] reputation amongst family members, friends, other members of the community for truthfulness?" The State objected and the circuit court sustained the objection. The defense rephrased the question and asked if Flowers was familiar with M.W.'s reputation in the community for truthfulness. Flowers answered that she was familiar with M.W.'s reputation and explained that they were "in the same family within the community" and that M.W. was "a frequent topic of conversation." The defense then inquired if that conversation was about M.W.'s reputation for truthfulness. The State objected and the circuit court sustained the objection. The defense proceeded to rephase its questions and asked Flowers about the time frame regarding M.W.'s reputation for truthfulness. Flowers responded that there were "several instances within the family discussing it." Flowers was asked about other members of the community, besides family, and Flowers responded,

> "I'm not dialing in on one particular person that has come forward to me, but just I mean she is just a topic at school children or my niece or my cousin will talk about. I have had her brother spend the night at my house before and he's talked about her."

¶ 29    The defense further questioned Flowers on whether she had knowledge of anyone besides family members who had discussed M.W.'s reputation. Flowers responded that she was related to a "lot of people within the community" and she had "2 to 3,000" family members in the surrounding counties. According to Flowers, M.W.'s reputation in the community was that "[M.W.] likes to make up stories to be the center of attention" and that it was more than immediate family who were aware of M.W.'s reputation for truthfulness. Flowers testified that she was aware of M.W.'s reputation in 2019, 2020, and that "this has been ongoing it's kinda talked about as well."

¶ 30    Flowers named Angie Sipes, as an unrelated person who was familiar with M.W.'s reputation. Sipes worked with Flowers in 2019 and 2020. Flowers could not remember when she

had a conversation with Sipes about M.W.'s reputation, but Flowers believed it occurred within a year of July of 2020. Flowers testified that Sipes shared information when they were in "public." Flowers was further questioned on the context of her conversation with Snipes regarding M.W.'s reputation and Flowers responded,

> "Just topic of conversation while working. Just she had seen her out and about in public or a dance recital that was going on and just started conversation."

Flowers then testified that she was "not sure" if anyone besides Sipes had discussed M.W.'s reputation for truthfulness with Flowers.

¶ 31 Flowers additionally testified that she lived in Mason, Illinois, and not in Heartville, Illinois, where M.W. lived. Flowers acknowledged that the testimony of M.W.'s character was based on family discussions and personal experiences, except for the conversation that Flowers had with Sipes.

¶ 32 The defense argued that Flowers had a large family, and her family members were members of the community. Flowers's blood relationship with members of the community should not disqualify her testimony about M.W.'s reputation in the community. The State argued that Flowers testified to discussions with immediate family members and testimony on M.W.'s reputation in the community was vague. Flowers was unable to remember when she had conversations with Sipes and provided no context regarding those conversations. The State further argued that a conversation with one person who may have been a member of the community was insufficient to qualify Flowers to provide testimony of M.W.'s reputation in the community.

¶ 33 The circuit court found that Flowers was evasive when she testified and never stated that she knew of M.W.'s reputation in her community. Flowers had only testified that Sipes had said "something," but testimony of M.W.'s reputation in the community was never developed. The use of reputation testimony by Flowers was denied.

¶ 34    The trial resumed and B.M. testified for the defense. B.M. was 15 years old, and the defendant was B.M.'s godfather. B.M. attended D.S.'s baptism and was in the basement with the other children on the day of the baptism. They had made a fort out of the trampoline, and they watched a movie. B.M. testified that she could not see the television from the trampoline because it was behind the couch. The defendant was in the basement for less than a minute, to tell the children that it was time for cake and ice cream. B.M. additionally testified that M.W. never appeared upset that day. Photographs of the defendant's basement were taken approximately two weeks prior to trial based on B.M.'s recollection of the event and admitted into evidence.

¶ 35    Laura Schorman, the defendant's wife, testified that she had been in a relationship with the defendant for 15 years and they were married for 11 of those years. They had two daughters and their youngest, D.S., was baptized on July 12, 2020. After the church service, family members and other guests went to the Schormans' home for lunch and cake and ice cream. Eight children were at the gathering, and they were in the basement before the defendant went downstairs to the basement to ask the children to join for cake and ice cream. He was in the basement for less than a minute. Laura testified that nothing appeared unusual about the defendant's behavior or M.W.'s behavior during the gathering.

¶ 36    Laura was present for the camping trip that occurred a couple weeks after the baptism. Laura's daughters and M.W. slept in a 53-foot fifth wheel camper with Laura and the defendant. Laura testified that the defendant had hurt his back when they were setting up the campsite. The defendant tucked the children in at night and Laura was in the main area of the camper approximately five feet from the beds. Laura testified that the defendant was in the bunk bed area for less than a minute.

10

¶ 37    Laura testified that the following day, the defendant was watching television from the couch inside the camper because his back was bothering him. The children went in and out of the camper all day and had watched television with the defendant. Laura testified that she was caring for D.S., her baby that had been baptized a few weeks before the camping trip. Laura was going in and out of the camper all day long to change D.S.'s diaper, grab items for D.S., or to help the other children. That evening, the defendant tucked the girls into bed again. Laura testified that he was in the back bedroom for a shorter amount of time than Friday night because his back pain had increased. M.W. never mentioned anything to Laura about the defendant and Laura testified that M.W. never appeared upset during the camping trip.

¶ 38    Laura testified that she was present when Mother confronted the defendant about the allegations made by M.W. Mother had shown a video of M.W. stating what had happened. Laura testified that the video from that day was different from the video that was played in the courtroom. Laura additionally testified to the defendant's reputation in the community. She testified that the defendant "would do anything for anyone," and he had a reputation for honesty and truthfulness.

¶ 39    The defense rested after Laura's testimony concluded. The defendant did not testify. After the parties presented closing arguments, the jury deliberated and found the defendant guilty of aggravated criminal sexual abuse.

¶ 40    The defendant filed a posttrial motion and argued that the State failed to prove the main elements of the charge beyond a reasonable doubt. Specifically, the State failed to prove the defendant's age as no witnesses had testified to the defendant's age and no circumstantial evidence was presented which would have proven the defendant's age. The defendant additionally argued that the circuit court erred by denying the defense the opportunity to present character evidence of M.W.

11

¶ 41    The State responded that it was required to prove that the defendant was over the age of 17 and were not required to prove the defendant's actual age. The facts showed there was adequate evidence presented regarding the witness in general, including that he was married to Laura, which was sufficient for the jury to infer that the defendant was over 17 years old. Additionally, the jury was able to observe the defendant in the courtroom.

¶ 42    The State also argued that the circuit court made the correct ruling regarding the testimony of M.W.'s reputation for truthfulness where Flowers was found to be evasive during the *in camera* examination. The circuit court denied the defendant's posttrial motion and proceeded to sentencing.

¶ 43    The defendant was sentenced to the maximum four years of probation, and 180 days in jail, subject to work release. This appeal followed.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, the defendant argues that the circuit court erred in excluding a defense witness's testimony of the victim's reputation for dishonesty. The defendant additionally argues that he received ineffective assistance of counsel where trial counsel presented testimony of the defendant's age, an essential element of the charge of aggravated criminal sexual abuse, after the State failed to prove that the defendant was over 17 years old at the time of the offense.

¶ 46                              A. Reputation Testimony

¶ 47    A witness may be impeached by testimony showing a bad reputation for truthfulness. *People v. Clauson*, 261 Ill. App. 3d 373, 377 (1994). An offer of proof regarding reputation testimony, outside of the presence of a jury, must be made to establish the foundation prerequisite to the admission of the testimony during trial. *Clauson*, 261 Ill. App. 3d at 377. "The reputation witness must be shown to have adequate knowledge of the subject." *People v. Bascomb*, 74 Ill.

12

App. 3d 392, 395 (1979). For reputation testimony to be allowed at trial, the general reputation of the defendant's truthfulness in the neighborhood in which the defendant lives or at the defendant's workplace must be established. *People v. Williams*, 139 Ill. 2d 1, 21 (1990). Reputation testimony cannot be based on the witness's observations or opinions. *People v. Dorff*, 77 Ill. App. 3d 882, 888 (1979).

¶ 48    Impeachment of a witness's reputation for truthfulness is allowed regardless of the age of the witness. *People v. Cookson*, 215 Ill. 2d 194, 213 (2005). Additionally, the reputation testimony "must relate to the witness' reputation at the time of trial." *People v. Kliner*, 185 Ill. 2d 81, 173 (1998). The circuit court has discretion to determine whether a witness is sufficiently qualified to testify to the reputation of another witness and that decision will not be disturbed absent an abuse of discretion. *Clauson*, 261 Ill. App. 3d at 377.

¶ 49    The defense presented the testimony of Flowers, outside of the presence of the jury, to establish that M.W. had a reputation in the community "to make up stories to be the center of attention." Flowers's testimony was mainly based on her personal knowledge of M.W.'s reputation prior to July of 2020, and was derived from conversations with relatives. Flowers also testified that conversations regarding M.W. were ongoing and she considered a large amount of people in the community to be relatives. Flowers testified that she was familiar with M.W.'s reputation in the community.

¶ 50    The circuit court determined that the defense had not developed a proper foundation to impeach M.W. regarding her reputation for truthfulness where Flowers was evasive during her testimony. While the circuit court has discretion to admit such testimony, we find that the circuit court abused its discretion by not admitting the testimony of Flowers.

¶ 51    We also consider whether the error, if any, was harmless. If the evidence supporting the conviction of a defendant is so overwhelming that the defendant would have been convicted without the error, then the error may be deemed harmless. *People v. Kucharski*, 346 Ill. App. 3d 655, 663 (2004). The jury viewed M.W.'s video interview from the CAC, the video taken by Mother, and M.W. testified at trial. M.W. consistently explained the incidents where she was inappropriately touched by the defendant. Witnesses confirmed that the defendant and M.W. were together during the incidents as described by M.W. The evidence against the defendant was overwhelming. Allowing Flowers to testify that M.W. had a reputation of making up stories to be the center of attention would not have had an impact on the outcome of the trial. Because the outcome of the trial would not have been different, we find that the error was harmless.

¶ 52                      B. Ineffective Assistance of Counsel

¶ 53    The defendant was charged with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)). Aggravated criminal sexual abuse is committed when a "person is 17 years of age or over" and "commits an act of sexual conduct with a victim who is under 13 years of age." 720 ILCS 5/11-1.60(c)(1)(i) (West 2020). The State has the burden to prove the elements of the charge including that the defendant is 17 years old or over. *People v. D'Angelo*, 30 Ill. App. 3d 86, 90 (1975).

¶ 54    Although the record indicates that the defendant was in his 40s when the conduct occurred, the defendant claims that the State failed to prove that the defendant was over 17 years old at trial. The defendant further claims that the evidence necessary to prove the defendant's age beyond a reasonable doubt was elicited by defense counsel. The defendant, therefore, argues that defense counsel provided ineffective assistance where the defendant was prejudiced by defense counsel's deficient performance for proving the essential element of the offense.

14

¶ 55　　When determining whether a defendant was denied effective assistance of counsel, the defendant must demonstrate that defense counsel's performance was deficient where it fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 56　　To establish deficient performance, the defendant must demonstrate that counsel's performance at trial was "objectively unreasonable under prevailing professional norms." (Internal quotation marks omitted.) *Gunn*, 2020 IL App (1st) 170542, ¶ 94. The defendant must overcome a strong presumption that defense counsel's actions were based on sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007).

¶ 57　　When considering the second prong of the *Strickland* test, the defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gunn*, 2020 IL App (1st) 170542, ¶ 96. Prejudice is established where the defendant would not have been found guilty without the defense counsel eliciting testimony which proved an essential element of the State's crime that the State had failed to prove. *People v. Jackson*, 318 Ill. App. 3d 321, 328 (2000). Where the evidence against the defendant is overwhelming, the reviewing court will not be persuaded that it is reasonably probable that a jury would have acquitted the defendant in the absence of counsel's alleged errors. *Gunn*, 2020 IL App (1st) 170542, ¶ 96.

¶ 58　　"The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable

15

doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing a conviction, the question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Cunningham*, 212 Ill. 2d at 278 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 59 The State may rely upon circumstantial evidence to prove essential elements of a crime as long as the State provides proof beyond a reasonable doubt. *People v. Laubscher*, 183 Ill. 2d 330, 335 (1998). In *D'Angelo*, the defendant was described as an "adult" and that testimony was considered tantamount to an expression of an opinion that the defendant was at least 17 years old. *D'Angelo*, 30 Ill. App. 3d at 90. This testimony along with additional factors concerning the defendant's age were considered when determining the defendant's age. *D'Angelo*, 30 Ill. App. 3d at 90.

¶ 60 In this case, the State relied on circumstantial evidence through the testimony of multiple witnesses to prove that the defendant was an adult, at least 17 years old. The State's evidence regarding the first incident included that family members had gathered at the defendant's house after the defendant's youngest child was baptized. Witness testimony distinguished "children" from the "adults" as the children played in the defendant's basement during the event. The defendant went downstairs "to let the kids know it was time for cake and ice-cream." The second set of incidents occurred when M.W. joined the defendant's family on a camping trip where M.W. slept in the defendant's camper with the defendant, his wife, and their two children. The defendant's oldest daughter was three or four when the incidents against M.W. had occurred. M.W.

testified that the defendant was her uncle, and M.W.'s in-court identification of the defendant was admitted into evidence.

¶ 61     The jury could have concluded from the evidence presented by the State that the defendant was an adult who was married with two children. The defendant also owned a home and camper. The circumstantial evidence presented by the State was sufficient for the jury to conclude that the defendant was at least 17 years old. The defense counsel's performance was therefore not deficient where the defendant was not prejudiced.

¶ 62                                    III. CONCLUSION

¶ 63     For the foregoing reasons, the defendant's convictions and sentence are affirmed.

¶ 64     Affirmed.